IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ROBERT STARKS,

    Plaintiff,

vs.      No. CIV 98-0630 JC/WWD (ACE)

RANDOLPH "DUKE" WHITE,
WILLIAM LOGAN, DAVE CORDOVA,
AND OTHER UNKNOWN AND SIMILARLY
SITUATED PERSONS ACTING IN CONCERT
WITH THE ABOVE NAMED PARTIES,

    Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. Findings of Fact

#### A. Description of the Property

Plaintiff Robert Starks was conveyed title to the Ute Mountain Ranch ("Ranch") on January 5, 1995, by a warranty deed recorded on January 11, 1995. The Ranch encompasses approximately 14,348 acres. The property is bounded on the west by the centerline of the Rio Grande, on the south by land owned by the Bureau of Land Management ("BLM"), and on the north by the state line of Colorado and a Colorado county road referred to as the "State Line Road." The southern boundary contained a BLM fence, and no other boundaries were fenced. The area surrounding Ute Mountain was open, undeveloped, range lands containing little more than sagebrush and fragile ground cover. No dwelling or similar structures are located on the Ranch, and no prior owner, employee or agent of a prior owner has ever resided on the Ranch.



### B.     Plaintiff's Purchase of the Ranch

Plaintiff purchased the Ranch in 1995 for the purpose of creating a wildlife protected area. In addition, Plaintiff wanted to improve the natural vegetation on the Ranch by plowing, reintroducing native seed for grasses, and supplementing water resources for the wildlife by drilling a well.

In order to make the Ranch safe for wildlife, Plaintiff believed that it was necessary to fence out livestock from the open range. Initially, Plaintiff was in no hurry to fence the property. However, he changed his mind when he discovered evidence of trespassing and poaching. Consequently, Plaintiff completed construction of a wire fence with a locked gate on the northern boundary of the Ranch in the spring of 1996 and extended the perimeter fence around the east and west boundaries. The northern fence was placed well within the property boundary and was posted in accordance with New Mexico law. Plaintiff also hired Steve Johnson to plow and plant approximately 1,197 acres.

The prior owner's permission to allow public access over the Ranch as a matter of neighborly accommodation was withdrawn when plaintiff constructed the perimeter fence. To area residents, the installation of a fence means that persons desiring to enter the owner's property must have permission. Thus, it was reasonable for Plaintiff to erect a fence around the perimeter of the Ranch to protect his improvements, preserve the native vegetation and wildlife, and to give notice to the general public that permissive access over the Ranch had been terminated.

### C.     Defendant's Claim

In the summer of 1996, Defendant Randolph "Duke" White asserted a claim to the Ranch, adverse to the title and possession of Plaintiff. Defendant maintained that access over the Ranch

was necessary in order to reach scenic and recreational sites along the Rio Grande, an area referred to as the "Scenic Easement." In order to gain access to the Scenic Easement, Defendant cut the Plaintiff's fence and installed his own gate. Defendant also removed "no trespassing" signs installed by Plaintiff and stored them at his property. Defendant cut the northern fence to gain access to the Ranch on numerous occasions without authorization, and each entry was without the owner's consent. Defendant also proclaimed his intent to continue to damage the fence and enter onto the Ranch without Plaintiff's authorization.

In 1996, Defendant mailed Plaintiff a "notice of claim," styled as a complaint in federal court threatening further damage to the Ranch. Defendant also posted notices on the Ranch indicating his intent to continue trespassing. Before Defendant began these activities, neither Plaintiff nor any prior owner was orally notified or received any written claim that Defendant or any other member of the public claimed any right of access over the Ranch.

Due to the actions of Defendant and the assertions of his intent to continue trespassing and removing fences, Plaintiff suffered damages for fence repairs. Plaintiff incurred expenses for fence repairs in the total amount of $2,410.48 (fence reconstruction at $2,019.94 plus fence posts at $390.54).

### D. The Scenic Easement

As mentioned previously, title to the Ranch is held subject to a "Scenic Easement." The Scenic Easement was delivered by a predecessor in title, the Public Service Company of New Mexico ("PNM"), to the BLM. The document was dated March 14, 1980, and filed for record in Book M-76, Page 443-447, in Taos County, New Mexico. The Scenic Easement is described generally as a strip of land contiguous with the western boundary of the Ranch and the centerline of the Rio Grande, and it is approximately 825 feet wide.

The Scenic Easement clearly and unambiguously describes the purposes for which it was granted and provides for certain limited rights in favor of the BLM. Specifically, the BLM gains the right to permit the public to walk on, and/or fish from the land contained within the metes and bounds description. Accordingly, it did not create a public access easement outside the boundary of the Scenic Easement over any portion of the Ranch. The BLM asserts no claim of public access, public highway, or public prescriptive easement over the Ranch or routes within the Ranch to access the Scenic Easement. Finally, the BLM has not accepted or maintained any routes within the Ranch as public access routes.

PNM granted the BLM the Scenic Easement to comply with the Wild and Scenic Rivers Act ("Act"), 16 U.S.C. § 1271, *et seq.* The Scenic Easement lies within the area designated as wild and primitive under the Act. However, it grants no right to the BLM for the construction of roads. Thus, uncontrolled access by the public to the Scenic Easement would be inconsistent with the expressed federal policy of designating the area for preservation as wild and primitive. The area is deemed to be generally inaccessible, except by trail under Section 1273(b) of the Act.

PNM intended to preserve the remainder of the Ranch in an undeveloped, unencumbered, natural state to encourage BLM's interest in the Ranch property. Granting any right of public access over the remaining portions of the Ranch to reach the Scenic Easement would have been inconsistent with PNM's purpose to preserve the property as undeveloped and unencumbered.

**E.     Access to the Scenic Easement**

An individual can access the Scenic Easement using various roads and trails. North of the Ranch, the state line road connects to the Scenic Easement and Rio Grande Gorge, as does the Colorado County Road G, Seminole Road, Piute Road, Tejon Trail, and County Road B, among others within Costilla County, Colorado. South of the Ranch, designated U.S. Forest

Service roads, Taos County roads, and BLM roads provide access to the Scenic Easement and Rio Grande Gorge. A reasonable necessity did not exist as of March 14, 1980, for the public to access the Scenic Easement by crossing over the Ranch outside the metes and bounds description of the Scenic Easement.

Access over the Ranch property to the Scenic Easement and Rio Grande Gorge was provided by "The Ranch Road" (also called the "Old Road"). The Old Road was a two-track, rough path that was never surveyed, graded, bladed, or paved. The visible effects of such use in aerial photographs of the Old Road is inconsistent with open, notorious, and continuous use by the public at large. Due to the fragile nature of the soils and terrain, a person's crossing of the Ranch in a particular path would be visible for many months and possibly years, even though no further travel occurred on the path. Photographic data from 1935 to 1995 shows no evidence of continuous use by the general public of routes or ways within the Ranch. In comparison, the visible use of the routes and ways within the Ranch during this time period is noticeably less than the use of roads on adjacent properties, where it is clear that only the owner and his employees would have reason to travel across them on a continuous basis. In addition, the visible use of all the routes and ways within the Ranch from 1982 to 1987 decreased dramatically compared with prior periods of use. Thus, the degree of use of the routes or ways onto the Ranch was visibly diminished over time, and the visible effects of such use is inconsistent with continuous, open, and notorious use by the general public. Rather, the photographic evidence of the routes or ways onto the Ranch is consistent with road or trail use by prior owners and family member of guests.

Furthermore, due to the distance of approximately 5 miles from the Costilla Creek Gorge and Rio Grande, the nearest neighbors would not have been able to observe the activities of anyone who might use the routes claimed to be public roads. No witnesses have observed

evidence of construction or maintenance of any road within the Ranch boundaries by any public authority.

Prior to the spring of 1996, no witness saw any "no trespass" signs posted on the Ranch, nor did any witness see anyone who was, or claimed to be, an owner of the Ranch. Prior to the installation of the fence by Plaintiff, no witness had ever been told by any owner of the Ranch that he was not allowed to be on the property or has received any protest from an owner objecting to his going on the land. No prior owner has ever resided on the Ranch or developed the Ranch from its natural, native state. Thus, it is impossible to distinguish from the physical evidence between an owner's use of a Ranch road and a non-owner's casual use of the road in an open range.

### F.     Actions by Prior Owners

During the ownership of the Ranch by the Rio Costilla Co-op Livestock Association from 1941 to 1956, each of the 182 members could use the Ranch roads and permit others to use the Ranch roads. In 1975, a quiet title decree and order of the court quieted title to the Ranch in Hickory Spinners, Inc., against the Rio Costilla Co-op Livestock Association, other named parties, and all unknown members of the public claiming adverse interests in the property.

During PNM's ownership of the Ranch, it was an absentee owner whose representative, David Bedford, visited the property once when it was purchased and did not see anyone using the Ranch roads.

During ownership of the Ranch by Naniloa Investments Co. Ltd., it was common knowledge that the area residents were permitted to cross the unfenced Ranch lands to fish, picnic, sight-see, and hike as a neighborly accommodation. Ray Smith of Naniloa Investments saw a woman and a boy on the Old Road at one time.

### G.     Documents

The Taos County Clerk's records contain no recorded grant of a right-of-way or easement over the Ranch for a public road to any federal, state, or local body. The Taos County Clerk's records also contain no evidence that any route or way over the Ranch has been accepted as a public highway by any federal, state, or local public body. Moreover, the New Mexico State Highway Department records for state and county roads in Taos County show no public roads, routes, or trails over the Ranch that have been claimed, accepted, or maintained by any public body.

As recently as 1995, BLM's public federal policy relating to access over private lands to reach public lands is to notify the public by a printed statement on its Surface Management Status Map for New Mexico that permission is required from the private landowner to cross private land, unless access is provided by a federal, state, or county road or a BLM road with legal access. When the BLM entered into the Stipulated Judgment filed in this action in March of 2000, it abandoned any public implied easement of necessity that may have previously existed.

Thus, any use by the general public of the trail to the Rio Grande Gorge was fair weather use and was sporadic, occasional, and for recreational purposes only. First, no credible evidence of open, notorious, adverse, or continuous use exists to support Defendant's claim that the general public, over time, created a public prescriptive easement over the Ranch. Second, no evidence of the essential element of unity of title exists to support Defendant's claim of easement by necessity. Third, there is not evidence of a prior grantor's acquiescence or acceptance and maintenance of the trails and routes within the Ranch by any public authority which would support Defendant's claim that these routes are public highways by implied dedication. Fourth,

there is no evidence of irreparable harm to the public which would support Defendant's claim of injunctive relief. Fifth, there is no evidence of unity of title between a prior owner of the Ranch and any public body. Sixth, no unity of title has ever existed between the BLM land south of the Ute Mountain Ranch and the Ranch property itself. Thus, Defendant's crossing of the Ranch was merely a way of personal convenience to reach the Scenic Easement and the Rio Grande, and it was not the only reasonable or convenient way, nor was it the access authorized by any public body.

## II.  Conclusions of Law

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1332(a) and 1391.

Plaintiff is the owner of the Ute Mountain Ranch, real property located in Taos County, New Mexico. Plaintiff is a bona fide purchaser under New Mexico's recording statutes and owner in fee simple of the Ute Mountain Ranch.

The Court's Order of November 14, 2000, disposed of several counterclaims raised by the Defendant and reserved for trial the issues of public prescriptive easement, public highway established by implied dedication, and public easement by necessity. Accordingly, Defendant's counterclaims were asserted and tried in good faith. However, the Court finds that Plaintiff's ownership of the property is free and clear of any claim of the Defendant, whether it be public prescriptive easement, implied dedication of public highway, or public easement by necessity.

First, Defendant claims that his right to use the roads and trails over the Ranch was authorized pursuant to a public prescriptive easement. A public right-of-way by prescription may be established by usage by the general public continued for the length of time necessary to create a right of prescription if the use had been by an individual, provided that such usage is open, uninterrupted, peaceable, notorious, adverse, under claim of right, and continued for a

period of ten years with the knowledge, or imputed knowledge of the owner. *See Lovelace v. Hightower*, 50 N.M. 50, 168 P.2d 864 (1946). In this case, the Hickory Spinners' quiet title decree issued in 1975 extinguishes any prior public claim of prescriptive easement. Defendant has failed to show clear and convincing evidence of continuous and adverse use of any specific Ranch Road by the general public, for a period of ten years, with the knowledge or imputed knowledge of the owner of the Ranch. The evidence of sporadic use of the routes and trails over the Ranch to the Rio Grande Gorge by members of the public is insufficient proof of the element of continuous use required for establishment of a public prescriptive easement, and no public prescriptive easement burdens the Ranch. Thus, Defendant has failed to meet the burden of proving by clear and convincing evidence each element of a public prescriptive easement over any Ranch Road.

Defendant next argues that his use of the roads and trails over the Ranch was authorized pursuant to an implied dedication of a public highway. "The essential elements of implied dedication are acts by the landowner that induced the belief the landowner intended to dedicate the road to public use, the landowner was competent, the public relied on the acts and will be served by the dedication, and there was an offer and acceptance of the dedication." *Luevano v. Maestas*, 117 N.M. 580, 586, 874 P.2d 788, 794 (N.M. Ct. App. 1994) (citing *Las Vegas Pecan & Cattle Co. v. Zavala County*, 682 S.W.2d 254, 256 (Tex.1984)). In this case, the evidence of sporadic use of the routes within the Ranch by members of the public for fishing, hiking, berry picking and other recreational purposes is insufficient to establish express or implied dedication for a public highway. The Ranch trails and routes are private roads or trails and are not public highways as defined by NMSA 1978, Section 67-2-1. There has been no implied dedication of a public highway within any portion of the Ranch because there is a total lack of evidence that any

public body has accepted or maintained any route or trail within the Ranch. Therefore, the public's sporadic, occasional recreational use of the routes and trails prior to 1996 is consistent with permissive use granted by owners of vast, remote, unfenced lands as a neighborly accommodation. Furthermore, when Congress designated a segment of the Rio Grande south of the Colorado border, and contiguous with the western boundary of the Ranch, as a component of the wild and scenic river system under 16 U.S.C. § 1274(4), it automatically withdrew that segment from entry, sale or disposition under 16 U.S.C. § 1279. The recorded March 14, 1980 Scenic Easement granted by PNM to the BLM dedicates no public roads on the Ranch by express grant or implied dedication.

Finally, Defendant argues that his use of the roads was authorized pursuant to a public easement by necessity. Easements by necessity arise from an implied grant or reservation of right of ingress and egress to a landlocked parcel. *See Herrera v. Roman Catholic Church*, 112 N.M. 717, 720, 819 P.2d 264, 267 (Ct.App.1991). An easement by necessity requires: (1) unity of title, indicating that the dominant and servient estates were owned as a single unit prior to the separation of such tracts, *Brooks v. Tanner*, 101 N.M. 203, 680 P.2d 343 (1984); (2) that the dominant estate has been severed from the servient tract, thereby curtailing access of the owner of the dominant estate to and from a public roadway; and (3) that a reasonable necessity existed for such right of way at the time the dominant parcel was severed from the servient tract. *See Herrera*, 112 N.M. at 720, 819 P.2d at 267. In this case, Defendant has failed to meet the burden of proof as to each element of public easement by necessity, and no easement by necessity burdens the Ranch. The neighborly accommodation presumption of permissive use applies to

the vast, remote, undeveloped, and unfenced Ranch property, the prior owners of which were absent and did not reasonably know of the public's claimed regular use of its roads. Moreover, the Scenic Easement is unambiguous and neither creates nor reserves one implied easement by necessity in favor of the public, or any individual, for access over the remainder of the Ranch. Upon the grant of the Scenic Easement, no reasonable necessity was created to pass over any other portion of the Ranch to reach the Rio Grande Gorge because other available public roads to the north and south provided such access. No unity of title existed in the general public to obtain any easement by necessity to pass over any other portion of the Ranch based on PNM's grant of the Scenic Easement to the BLM. Even if an implied easement by necessity was created by the Scenic Easement, it was expressly abandoned by the BLM in March of 2000 in the Stipulated Judgment and extinguished by the designation of available public access to the Rio Grande Gorge over public roads north and south of the Ranch.

Now, turning to Plaintiff's claims, each of Defendant's unauthorized entries onto the Ranch constituted a trespass. Defendant had no right to cut the fence and damage property of Plaintiff. Without the issuance of a permanent injunction, Plaintiff has no adequate remedy at law to prevent the continued trespass and damage to the Ranch and wildlife within it. Defendant should be, and is permanently enjoined from entering onto the Ranch for any purpose whatsoever. Any violation of this injunction will result in a minimum liquidated damage of $5,000. However, if Plaintiff can prove that actual damages exceed this amount, Plaintiff is entitled to an award of the actual damages incurred.

In addition, Defendant White should be, and is barred and forever estopped from having or claiming any right, title, or interest in the Ranch adverse to Plaintiff and his title to the Ranch, including, without limitation, any right or claim of right to pass over or to enter the Ranch for any purpose whatsoever. Plaintiff's title to the Ranch, as against Defendant, should be forever quieted and set at rest as against any claims of Defendant, his successors and assigned. Defendant should be, and is permanently enjoined from entering onto the Ute Mountain Ranch, outside the boundaries of the Scenic Easement, and on to any Ranch roads, routes, or trails.

A person who enters the lands of another without prior permission and damages any part of the realty or improvements is liable for damages in an amount double the appraised value of the property injured or destroyed. *See* NMSA 1978, § 30-14-1.1 (1983). Since Plaintiff has incurred expenses for fence repairs in the amount of $2,410.48, he is entitled to an award of double damages in the amount of $4,820.96.

Finally, Plaintiff argues that he is entitled to $570,000 in damages for the diminution in value to the Ranch sustained as a result of Plaintiff's repeated assertions of his intent to continue to trespass. However, damages for diminution in value are typically awarded when there is permanent injury to real property. *See* Richard R. Powell, *Powell on Real* Property, § 68.09(2)(a) at 68-39 (1998); *see generally Ravan v. Greenville County*, 315 S.C. 447, 434 S.E.2d 296 (Ct. App. 1993) (finding the measure of damages for permanent injury to real property,

whether asserted under nuisance, trespass, negligence, or inverse condemnation, is the diminution in the market value of the property). Here, the Court finds no permanent injury to Plaintiff's real property. Rather, the alleged diminution in value is speculative and remote. Accordingly, Plaintiff's request for $570,000 in damages for the diminution in value to the Ranch is denied.

Plaintiff is granted Judgment against Defendant for trespass and damages in the amounts set forth above. Plaintiff is granted Judgment against Defendant on each of Defendant's counterclaims.

DATED this 19th day of June, 2001.

_____
WARREN W. EGINTON
Senior United States District Judge